versus U.S. Environmental Protection Agency. Mr. Smith. Thank you, Your Honor. Good morning, my name is Joshua Smith. I'm here on behalf of Sierra Club and National Parks Conservation Association. EPA's approval of Louisiana Department of Environmental Qualities, Louisiana Hays Plan is unlawful for three reasons. First, best available retrofit technology determination for the Nelson Power Plant fails to meet the requirements of the Clean Air Act. Second, EPA unlawfully failed to provide a rational connection between its approval of that determination and its conclusion that key aspects of the underlying analysis were invalid and unsupported. And third, the plan fails to comply with the reasonable progress requirements of the Clean Air Act. On the first point, the EPA's binding regulations set the standard for best available retrofit technology. Under the act, states must require sources like the Nelson Power Plant to meet emission limits that are commensurate with the installation of scrubber to improve and eliminate haze. Unless the state can provide a carefully reasoned justification based on the five statutory factors and in accordance with EPA's binding regulations, that a different emission limit is justified. Louisiana's explanation for departing from that mandatory limit fails to comply with that standard. The state's explanation, its cursory two-sentence explanation, fails to acknowledge the standard, let alone carefully evaluate the conflicting evidence and the analysis that's fundamentally inconsistent with the finding that low-sulfur-coal, the least effective option, is somehow the best available retrofit technology. You used the word commensurate. Is that from the regulation or explain what you mean by commensurate? The regulation requires an emission reduction and efficiency reduction for sulfur dioxide that is equal to 95% or 0.15 pounds per MMBTU. That's typically associated with the installation of a scrubber. And again, that is a mandatory standard unless the state can provide a reasoned justification based on all five factors, statutory factors, that a different limit is warranted. And the state's cursory two-sentence explanation for departing from that standard is wholly inadequate and, at the outset, the state fails entirely to mention two factors. Of the other factors that it does mention, it fails to evaluate those factors in accordance with the BART regulations. And it's helpful to take them one by one. So basically, though, the relief you seek would be to send it back to the state to add some more sentences? No, that's not the relief we seek, Your Honor. The state, at the end of the day, has to make a carefully reasoned decision based on all the factors, and it must show its work. It must evaluate and grapple with inconsistent evidence in the record. So it not only has to have it there in the record, but it actually has to go through every single thing in great detail, if that's a requirement under the law. And what says that? That it not only has to be in the record, but that it has to be pinpoint analysis. The Clean Air Act requires BART determinations for sources like Nelson to be made in strict accordance with the BART regulations. Right, to follow the regulations, but where does it say you have to articulate every single element and have pros and cons of each one under each status, instead of just having it in the record? The regulations set forward a detailed methodology and their selection of the best alternative, the best retrofit alternative, and going through each of the elements reveals the fundamental defects in Louisiana's plan. You know, the best analogy I can think of is, as you know, we have hundreds, probably thousands of sentencing guideline cases every year, and there are a number of sentencing factors that district judges are required to take into account. And our case law basically says that the judges, if they say that they consider the sentencing factors, we don't require them to go through each one and explain how that particular factor is or is not satisfied, because we're confident that, in that case, the fact finder will have lived up to his or her representation that the factors have been considered. So that's well ingrained in our case law. I understand that administrative law is somewhat different, but I think it's a fair analogy. It is an apt analogy, Your Honor, and I'd like to take it a step further. In this case, EPA found fundamental defects in the analysis underlying the state's decision to go with a low-sulfur coal. It conducted its own analysis that is fundamentally incompatible with low sulfur coal. The EPA doesn't know how much the coal costs any better than the industry that has been buying the coal for some time. So it's not clear that EPA's analysis is better than the state's analysis on what the cost of the coal would be, and that's a fundamental point of difference. That's exactly right, Your Honor, but at the end of the day, the state must still provide rational connection between its selection and the outcome, and if the state believes that EPA's analysis is incorrect, it's incumbent upon the state to provide an analysis that shows why. And in the initial submission, Entergy submitted a price for coal. EPA found, looking at the company's own reported data that it reports to the Energy Information Administration, that that significantly understated the cost of coal. And so with that in mind, the state had an obligation to take a look at and resolve the inconsistencies. And going back to the sentencing guideline analogy, which I think is a good one, EPA's analysis is fundamentally inconsistent with what Louisiana found. And in this case, it would be as if the appellate court, reviewing a sentencing decision, told the district court, you made several errors of fact, you misapplied several principles, and sent it back. And instead of addressing any of those errors, the district court sent the opinion right back without making a single change, and without even acknowledging the errors of assignment that the appellate court made. And that may happen from time to time. And it wouldn't, yeah, and I'm sure it does. And it wouldn't make sense, then, for the appellate court to simply rubber stamp the district court's decision, simply because the district court had all the information before it. Counsel, are you going to address standing at some point? I don't want to get you off track from where you're going. But it's not at all clear that the different entities have standing here. Yes, Your Honor. In support of our briefing, we submitted five standing declarations of Well, that's that they are not visiting the Breton National Wildlife Refuge. And that's the one at issue here, isn't it? Two points. Both Breton National Wildlife and Caney Creek. Caney Creek in Arkansas. I don't believe that these declarations, maybe you can tell me which ones do, because I have them here, and I don't see that they say that they visited those, and they intend to go back to those particular ones. And we have case law that says for Article III standing, you have to have the future intent to go utilize the resource. I would encourage the court to go back and look at the declaration, the sworn declaration of Mr. Eustace, who conducts, is part of his professional duties as an ecologist and an employee of an ecological organization, is to go out and monitor at Breton National Wildlife Refuge. Mr. Eustace is the one? Because Connors does not, does Megan does not, do you agree with me that none of these other ones do? Mr. Eustace is the only declarant that regularly goes to Breton National Wildlife Refuge and behaves in that area, diminishes his ability to actually do his professional work. But he is not with the other group, the NPCA. So is there no declaration in the record that would support the NPCA standing? Your Honor, precedent says that standing for one is standing for all. We did submit a declaration on behalf of NPCA that discusses their institutional and associational interests. It doesn't say standing for all. It just says it's good and everybody doesn't have to have standing for it. It doesn't mean those people get relief. And it doesn't really matter if Sierra Club gets relief. You're correct, Your Honor. I was using a shorthand term. If I could pivot back, I would like to spend at least a few minutes talking about the reasonable progress prong of the Clean Air Act. EPA unlawfully approved a plan that fails to meet the elements of the reasonable progress part of the Clean Air Act. And in particular, in 2012, EPA declined to approve the long-term strategy element of the state's plan. And in so doing, instructed the state to go back and evaluate whether emission reductions for any source, including those that are not subject to BART, should be required to make reasonable progress toward eliminating haze. And it's important here to look at the plain text of the rule in light of EPA's new explanation here about why Louisiana doesn't need to comply with the statute. EPA at 37.435 declines to approve explicitly Section 308.D.3. That is the entirety of the long-term strategy, which, by its plain terms, requires Louisiana to go back and evaluate, under the four statutory factors, reasonable progress and whether emission limits should be required. EPA's newfound explanation for relieving the state of this obligation has no – it finds no support in the final rule from 2012 or the rationale. And in fact, it doesn't make any sense. EPA disapproved the state's SIP in part in 2012 because the state relied on a now-defunct rule called CARE to make emission reductions for both BART and non-BART sources. And EPA made very clear that it was unable to approve any aspect of the plan that relied on SO2 reductions under CARE. So as a result of the disapproval, there is now a gap in Louisiana's plan, and the state must go back and reevaluate reasonable progress, including for sources not subject to BART. Now, that obligation stems not just from the directive in 2012, the final rule there, but from the Clean Air Act and the Regional Haze Rule itself, which plainly require the state to evaluate those four statutory factors. And this isn't just an academic issue. There is extensive evidence in the record demonstrating that emission reductions from these non-BART sources would have important visibility benefits and would be cost-effective. I just want to come back to a couple more points on the BART issue, if I may, before the end of my time here. EPA's approval of the Louisiana plan reflects unreasoned decision-making. The agency itself fails to make a connection between its own finding that the analysis underlying the state's best available retrofit determination for Nelson is itself invalid and unsupported by the record. And it is not enough for the EPA to claim that the record contains all of the adequate information. What the record contained before EPA is essentially two analyses, one that EPA finds to be invalid and again unsupported, and those findings are in the final rule, which I would mention, no party challenged, including Louisiana itself. And then another analysis that EPA conducted, because it found Entergy's analysis so flawed, another analysis that the agency, EPA, conducted that shows, based on every metric and methodology required under the BART regulations, that low sulfur coal is not the best available option under any factor. And in fact, two of the most important factors, visibility benefits and cost, weigh heavily in favor of the installation of a scrubber. That's not true for annualized costs. Cost is better with the low sulfur fuel. That's a good point, Your Honor. The BART regulations, however, require that states evaluate cost on a cost effectiveness basis, which is annual cost divided by the pollution reductions that will be achieved. This provides for an apples-to-apples comparison between different technologies, because if annual costs alone were the determining factor, no state would ever require technology to be installed, because annual costs are always going to be more expensive than doing nothing at all. How is your client harmed if the goals are already being met? They're well under the goals. They're meeting them more than meeting the goals overall. That is not what the record reflects, Your Honor. Doesn't it, over time, that the majority have met the benchmarks, or well exceeded the benchmarks with the progress? A few quick responses. First off, that's a post hoc rationale that Louisiana raises in its amicus brief. It is not here to defend its decision in this case. Actually, at page 7 of the joint appendix, the only evidence in the record shows that the opposite is true. Louisiana is not on the glide path. If Louisiana wanted to make that argument, decide on that basis, it was incumbent upon the state to make that decision. Finally, the statute itself, EPA has repeatedly stated in unequivocal terms that being on the glide path itself is not a safe harbor from reasonable progress analysis. The state has to evaluate cost effective and reasonable control technologies and decide whether, under the statutory factors, it makes sense to require them. I do want to make one last point. Being on the glide path does not have anything to do with the BART determination. BART is independent of the reasonable progress goals and the factors. The Clean Air Act itself requires the installation of BART, best available retrofit technology, regardless of whether the state is on the glide path. I would like to point out one last thing, if I may, before I... Yes, you may. We're a little bit flexible on the time. If there's another point that you haven't been able to make, you may go ahead. With respect to the visibility benefits associated with a scrubber, it's worth pointing out that EPA's assessment shows that a scrubber would result in three times the benefits of low sulfur coal, nearly eliminating Nelson's impacts to every class one area that it affects. Given the statutory mandate under the BART section of the statute to eliminate haze, the state was required or it was incumbent upon the state to explain why a technology that would virtually eliminate haze pollution from a particular source was not worth the cost to make that happen. I couldn't find... Maybe you can tell me where it says the age of the unit is continued existence, how long it's expected to last. That's a good point. There is no reference by the state to the remaining useful life factor. If the remaining useful life is small, then that would be a reason not to do that. Yeah, it would be. In both Entergy and EPA's assessment, the remaining useful life factor was essentially a wash because there are no binding commitments for the unit to retire. At the end of the analysis, that doesn't have an impact one way or another. On the last factor, very quickly, the environmental impacts factor. The state does cite this in its cursory two-sentence explanation. Both EPA and Entergy, in their analyses, already incorporated those costs into the overall cost assessment, and EPA concluded that there was no significant impacts from the installation of a scrubber. If the state disagreed with EPA's analysis, again, it was incumbent upon the state to grapple with the facts in the record and come up with a rational conclusion based on those facts and the five statutory factors. I know my time is up. Yes, and you've saved time for about a minute. Thank you. Street? May I please the court? Aaron Street on behalf of the industry petitioners. During this portion of my argument, I'm going to discuss the industry petitioner's challenge to EPA's affirmance of Louisiana's finding that the Nelson and Brain units are subject to BART. Those are units owned by my clients, Entergy and Clico. At this time, I'm not going to respond to what you just heard. I'll pick up that theme on the intervener's portion of my argument. In particular, I'll focus on why the state's exclusive reliance on the CalCuff model, which is unreliable at distances of greater than 300 kilometers, prohibited EPA from approving Louisiana's subject-to-BART determination for these units. I think at the outset, it's important to just reset and remember what the regional HAES program is all about. As this court recognized at footnote 42 of its Texas versus EPA decision in 2016, the purpose of the regional HAES program is not generally to advance human health by reducing emissions overall. The purpose is to improve visibility in national parks by targeting the sources that affect that visibility. Using wildly inaccurate or overly conservative modeling to reach far-distance sources, sure, that will lead to a decrease in emissions overall, but it will not accurately target which sources are reasonably anticipated to contribute to those visibility impairments. I would submit that the court has to address two questions that I'll focus on this morning to address petitioner's challenge. First, the court has to decide whether it was improper or arbitrary for EPA to affirm Louisiana's exclusive use on CalCuff. If the court finds that that was improper because CalCuff's unreliable by EPA's own admission at more than 300 kilometers, then the court has to reach a second question, which is whether EPA can then substitute its own rationale, its own CAMEX methodology that the state did not rely on, or whether at that point the state should have been disapproved and the state should have an opportunity to select its own methodology and its own rationale for subject-to-BART determinations. What relief do you actually seek? Our relief is that the aspect of EPA's action that approved Louisiana's subject-to-BART determination should be vacated. That would mean that Louisiana would go back and make that determination again. It would, under principles of federalism and the way the structure of the Clean Air Act works, Louisiana would have the opportunity in the first instance to select which model and which methodology it wants to use. CalCuff would be ruled out in our view. It could accept whichever model it wanted, and then it would make the determination of subject-to-BART, and then EPA would review that determination. I suppose EPA could also do a PIP if it wanted to. But I do think it's worth pointing out in response to your Honor's pragmatic question, well, what's the real harm here? We're past the first planning period. This case is all about the first planning period, which ended December 31, 2018. So in a very real sense, a lot of the relief that our friends are requesting is functionally moot. And this is all going to have to be done again in 2018 through 2021 planning period. The state will have to come up with a new SIF anyways that addresses reasonable progress, addresses subject-to-BART, addresses BART controls. And so I think that's relevant to some of the other arguments we'll talk about more than it's relevant right now, because these controls are being put into place right now. It might tangentially be relevant, though, because the CalCuff was used for the other states because they came before the new determination that CalCuff was not going to be used in other contexts. So everybody else will use CalCuff for this stage, right? That is largely true with respect to the states that did their own SIFs. For example, in the Texas FIF, which of course would be EPA's action, they looked at distances longer than 300 kilometers using both CalCuff and CAMEX because they recognized the shortcomings of CalCuff at that distance. But all your comparators were using CalCuff because it was an earlier time period. I don't exactly agree with that, Your Honor. I agree with the factual statement that they were all using CalCuff when the states did their analysis, but I would not characterize them as comparators for two reasons. First of all, EPA consistently upheld states when they refused to look at sources that were farther away than 300 kilometers. So they're not comparators to us on that instance. Louisiana looked at sources that were 350 to 460 kilometers away from Class I areas. We're not just talking about 301. We're talking about 16 to 33 percent further than the maximum distance EPA said for which CalCuff was reliable. And also when you look at some of the older CalCuff uses, EPA of course in their rules says, well, we did use CalCuff twice before for more than 300 kilometers. One of those was a very old use before there were any other options for modeling. There was no CAMEX developed at that time. And so I don't think the comparator analogy is exactly accurate. And it would be a significant relief both for our clients, and I think it would be a very important precedent for the agency and the states going forward to know we're taking you at your word when you say CalCuff is unreliable at more than 300 kilometers. The states would know, okay, we need to cut it off at 300 or we need to have some exceptional justifications, tweaks to the model to allow the use of CalCuff at a longer distance. You're the first to say that. Right. It hasn't been addressed one way or the other by a federal court of appeals. I think the closest federal court of appeals guidance we have on this is Judge O'Scanlan's opinion in the National Parks Conservation Association versus EPA, which is a 2015 Ninth Circuit decision. And in that case, sources further than 300 kilometers were not considered. And Judge O'Scanlan said that was fine, that EPA gave a good reason for that. And he characterized EPA's rationale as having said that the model was, quote, not suitable for very long-range transport, more than 300 kilometers. Do we have to give some sort of deference to that 2005 BART guideline that says that it's recommended? Yes, but I think the BART guidelines must be read as a whole. And Appendix W to the BART guidelines, which is cited in our opening brief, expressly says that CalCuff produces reasonable results so long as the distance is limited to 300 kilometers. So we're not complaining about the guidelines. We're actually saying enforce the guidelines and not only enforce Appendix W to the guidelines, but EPA as a federal administrative agency must act consistently with its task actions excluding sources beyond 300 kilometers, or it must give some sort of reason, explanation for why it's departing from those previous examples. And as I mentioned, both in the New Mexico and the Arkansas regional HAES programs, the agency repeatedly said we're not going to look at distances longer than 300 and affirmed states that refused to do so. The Montana federal implementation plan was the one at issue in the Ninth Circuit opinion. Again, the agency was consistent there in saying it was not suitable for looking at longer than 300. So it's your position then that we wouldn't be failing to defer to EPA's complex scientific data. We would, in fact, be relying upon EPA's complex scientific data to say not more than 300. Yes. Is that your position? That is our position with respect to the CalPUF piece of the analysis. EPA has been really quite consistent in drawing the line at 300 kilometers. And, of course, if they came in and said it was 310, we thought that through and we think that's going to work, okay, we would be fine with that. But we're looking at 350 to 460 and with no rationale given for why it's appropriate to use CalPUF at that length. Now, what EPA has said is two things. I've referenced one. EPA in the rules said we've used CalPUF at longer than 300 before. As I mentioned, one of those was so old there was no other option to use. The other one was very instructive. The other one is the South Dakota Regional Haze proposal. And in South Dakota, EPA correctly says they did use CalPUF for longer than 300 kilometers. But in the South Dakota rulemaking, what EPA said, and it's quoted in our reply brief, EPA said as a general rule we cannot use CalPUF from longer than 300 kilometers, but we worked with South Dakota to develop a, quote, specialized model to address the shortcomings of CalPUF for these further distance sources. EPA did not do anything of the sort with the state here. They simply ran a traditional CalPUF, and then in the rule they try to reverse justify it and essentially say, well, the only other reason they give, my second point on the EPA's insufficient reasons for departing from the previous rationale is that they essentially said, well, these units have really high emissions. They're creating problems at greater than one deciview. But they never explain how that relates to the model or why the fact that the emissions are greater makes an unreliable model reliable. If they had done the margin of error analysis and said we can handle the unreliability of this model because the outputs are so large, then perhaps we would be deferring to their scientific expertise. But they didn't do any of that work like they did in the South Dakota analysis. So I guess I would turn to my second aspect of my argument, which is EPA cannot approve a SIP on a basis that Louisiana did not use. So EPA, we think improperly, said the CalPUF was appropriate, but then they moved on, perhaps recognizing CalPUF was not reliable, and did their own CAMEX analysis. That's a backup argument for the EPA, right? And we don't reach it if you lose on your CalPUF argument. Yes, I agree with that, Your Honor. But if we do reach it, the EPA can't rely on CAMEX. Only if Louisiana had used CAMEX can EPA have used it. Yes, that is our position, and that follows from the principles of federalism enunciated in Texas v. EPA and also from the way the Clean Air Act works, which is, as EPA admits, the states get to select the methodologies for determining which sources are subject to BART. EPA then has two choices, or really three choices. It can say the SIP is incomplete, it can disapprove the SIP, or it can approve the SIP, and those are the options that it has. What it cannot do is select its own methodology and do its own analysis that the state did not rely on and then essentially reverse engineer approval of the SIP. Can you explain this basic question? Sierra Clubs Council has already referred to this. Where is the state? Isn't it their plan that's being either upheld or stricken down in various parts? I'm confused by that. I can't speak for the states, Your Honor. But they're an amicus in the case? That's correct. They're an amicus, and I think their amicus brief does do a couple important things, one of which is it affirms that the state relied solely on CALPA. It wasn't approving or considering the CAMACS model at all, and I think that is somewhat inconsistent with some of the arguments you hear at times from EPA in their briefs where they seem to say, well, Louisiana included the CAMACS analysis in its rulemaking, but Louisiana expressly says several times, including in its amicus brief, that they did not rely on that in the rulemaking. And finally, I want to just point out that this argument that we're making about the level of deference and the role of the federal government versus the state, of course, comes into play in all of the arguments that we're talking about today. And you've heard my friends on the other side from Sierra Club say that the state should have weighed the factors differently and EPA should have re-weighed the factors for them if they didn't like the way the state did it. Our position on our first argument is not that the federal government should have re-weighed what the state did. It should have looked at what the state did, and it should have determined whether it was valid under existing guidelines, under existing EPA precedent. And then that should have been the end of the game. It should have then sent the issue back to the state and then deferred or considered deferentially whatever the state did at the end of the day. And if there are no further questions, I'll save the remainder of my time for rebuttal. Yes, you've saved rebuttal time. Thank you, Mr. Street. Ms. Baines? Good morning, and may it please the Court. My name is Sheila Baines, and I represent the United States. With me at Council's table are Daniel Schramm and Nora Greenblatt from EPA's Office of General Counsel, and Adobe Wongwa and Michael Feldman from EPA Region 6. So why don't you address this 300-kilometer issue first? Certainly, Your Honor. It's fresh on our minds. Industry focuses heavily on what it portrays as a hard rule that CALPUF is not reliable at distances over 300 kilometers. But there is no such rule. EPA has never determined, nor even suggested, that CALPUF shouldn't be used to model visibility impacts more than 300 kilometers from the emission source, or that the model cannot reliably or reasonably predict impacts at such a distance. While EPA has acknowledged that CALPUF's accuracy decreases as the distance between the source and the Class I area increases, the agency, quote, has indicated historically that the use of CALPUF was generally acceptable at 300 kilometers or greater for larger emission sources with elevated stacks. And that's in the record at Appendix 173. So address the South Dakota case that has been discussed. Doesn't that sort of indicate to the contrary that the 300-kilometer limit is significant and that a special deal was worked out in that case? Yes, Your Honor. In the South Dakota case, and first of all, I'll point out that that's not an issue that was raised by petitioners in their opening brief. But in the South Dakota instance, South Dakota used CALPUF at distances in excess of 600 kilometers. And South Dakota developed its own protocol, which EPA did not explicitly endorse. But EPA did accept the use of CALPUF for those distances based on the further considerations that EPA always looks to, such as in the Texas 2009 sit, where Texas used CALPUF to do subject-to-BART screening, which is the process we're looking at here, also at distances upwards of 600 kilometers. Nebraska has also used CALPUF at those longer distances. And to address the industry's point about New Mexico and Arkansas, the reason that Class I areas at a further distance than 300 kilometers were not considered in those two states analyses was because there were Class I areas that were within 300 kilometers. And the BART guidelines are explicit that it's not necessary to look at all the Class I areas for modeling if the modeling for the closer-in Class I areas is sufficient to demonstrate that a source is subject to BART. The guidelines don't expect a state to continue modeling all of the farther and farther away sources when they've already established that it's subject to BART. So that's how the New Mexico and Arkansas cases are explained. And going back to the fact that EPA looks at those further considerations, for larger emission sources with elevated stacks, Nelson and Brame are textbook sources where CALPUF has been deemed reliable at these farther distances. They're extremely large sources, two of the largest sources in the state of Louisiana, and they have elevated stacks, which increases the reliability of CALPUF. It was entirely reasonable and consistent with past practice for EPA to approve Louisiana SIP based on its reliance on CALPUF to evaluate the potential visibility impact from these sources. Petitioners have not given any valid reasons why the state of Louisiana should be forced to depart from the BART guidelines. In the BART guidelines in 2005, EPA made explicit that CALPUF was the preferred model, and in 2017, in the action that industry also relies heavily upon, EPA in fact doubled down on its preference for CALPUF in this specific context. EPA did remove CALPUF as the preferred model in a very different context under the Clean Air Act in looking at PSD permitting situations and attainment demonstrations. In that rulemaking, EPA was simply providing more flexibility for states to use a number of different methodologies. It didn't say CALPUF wasn't allowed in those contexts, just that it wasn't the preferred model. However, EPA did say just two years ago that CALPUF remains the standard for conducting subject-to-BART screening in the Regional Haze Program. Moreover, Louisiana is one of... Excuse me, Your Honor? The margin of error, even using this less accurate tool? So the margin of error is a red herring, Your Honor. Those comments were adequately responded to in EPA's final rulemaking, where EPA explained that this concept of a margin of error has no basis in any of the modeling guidance for CALPUF, and it has no applicability in the BART process. In addition to that, even if such an analysis were to be appropriate, the analysis that's provided by Entergy and CLECO, it's fundamentally flawed, and we've summarized the ways it's flawed on page 82 of our brief. In short, if Your Honor is curious to know why, they essentially... Great. Industry essentially glommed together the CAMEX results and the CALPUF results, even though those are fundamentally different methodologies that use completely different assumptions and processes. They basically glommed the results together, compared them to monitoring data, which comparing CALPUF to actually monitor data is like comparing apples and oranges, because CALPUF is designed to isolate just the impacts of a single source, whereas monitor data is always going to show you the full universe of all the different impacts that are taking place in that moment. So when has CALPUF been used beyond 400 kilometers without criticism? So in addition to the South Dakota example, it's been used... Without criticism. I'm sorry? In the 2009 Texas SIP, it was used in the range that was used here, between 300 and 450 kilometers. Actually, in Texas, it was used upwards of 600 kilometers. That was also the case in Nebraska. Is any of this moot? If we were to have to send it back on either for the Sierra Club's points or for Entergy's points, aren't we already beyond this stage? Are you referring to the planning process? Yes. So the first planning period requirements don't disappear after the end of the planning period, so it is still relevant what's been determined. In addition, EPA doesn't share the position that 2018 constituted the end of the planning period. When does EPA think the end of the planning period was? I don't have that information in front of me right now, Your Honor, but I'd be happy to consult with... Once the planning period is over, though, what's the point? Well, the controls that are put in place in this planning period are expected to be in place for potentially the remaining useful life of the facility, so this will continue to have impacts long into the future. But as to your question about the potential mootness... Was Mr. Street just making something up when he said the plan period ended at the end of 2018? I'm not sure what he's basing that statement on, Your Honor. But you're saying that's inaccurate, that there was nothing that ended on December 31, 2018? It's not EPA's position that the planning period ended on that date. And it's not EPA's position that the planning period ends ever? I don't have that information with me at this podium. This is a question that just came up in argument today, and it's not something that we briefed, Your Honor. But I would be happy to provide supplemental briefing on that issue if you would request that. Going back to Your Honor's question about the practical impacts here, it's important to note that industry's challenge takes place at Step 2 of the BART setting process, and that's a screening stage. States are afforded a great deal of discretion at that preliminary stage. And, in fact, if this were to be sent back to the state, the state would be well within the guidelines to simply advance every single BART-eligible source to be subject to BART. The guidelines allow for that. The state could perform no modeling or analysis whatsoever. And that would be upheld, the D.C. Circuit's decision, U.R. versus EPA in 2005, upheld the validity of that option, which is codified in the BART guidelines from 2005. If the court decided to follow its sister circuit in the D.C. Circuit, yes, Your Honor. And it's consistent with the BART guidelines, which explicitly provide that as an option to the state. And it's EPA's position that the state would have been well within its rights to do that. Moreover, the state was free to submit a SIF that was more stringent than the act required. It's not EPA's position, factually, that the state did that here. But if the state had said, we'd like to include all of the BART-eligible sources as subject to BART because we'd like to have visibility improved even faster to surpass the federal benchmarks for visibility, that would have been perfectly allowable, and EPA would have still been compelled to approve the state SIF. Section 110K3 of the act states that if EPA determines that all applicable requirements of the act have been satisfied by a state SIF, EPA must approve the SIF. So even if the state had been over-inclusive here, which we don't factually assert, but even if it had, EPA still would have been compelled to approve the SIF. Why did EPA include the CAMEX modeling, and how is that at all appropriate? Well, a few things, Your Honor. EPA was under a consent decree deadline to promulgate a SIF, and that deadline was fast approaching when Louisiana submitted its SIF. So EPA was already conducting CAMEX for Texas. It's very expensive and resource-intensive to run CAMEX. In anticipation that it might need to craft a SIF for Louisiana, EPA performed CAMEX. Also, even if you have it in your back pocket, why is it appropriate to include your own analysis when it's supposed to be the state's analysis, the relevant things that may be evaluated? Well, the state's analysis is important, but EPA is primarily, not in the first instance, but EPA has the overall responsibility to ensure that the Clean Air Act, that the requirements are being satisfied. EPA has the authority to say that you can do your own analysis and rely on that in this context that's supposed to be this cooperative federalism. Well, Section 110K3 of the Clean Air Act requires EPA to look at the submittal as a whole. And here, after EPA provided the CAMEX modeling to the state, the state included that modeling analysis with its submittal. So you're saying the state relied on the modeling analysis of the EPA? The state didn't rely on it, Your Honor, but the state did include it. We can't do anything the state didn't rely on, can we? But the state included it with its SIF, so it was part of the state's submittal, even if it wasn't explicitly part of the state's rationale. What authority do you have in terms – do you have any case ever that fulfilled that sort of process? EPA has been doing this for decades, and it hasn't been challenged, so we don't have a case that explicitly supports that. But it's very routine for EPA to support modeling as part of its partnership role with the state. EPA has a great deal of expertise in this area and often has greater resources than the state. But they didn't ask you to do it, and they didn't rely on it, so it's really not part of the SIF. EPA's position is that it is part of the SIF because it was included by the state. Just as when we discussed the environmental petitioner's challenges, it's also EPA's position that the analysis on the five factors provided by EPA is also part of the SIF because it was included by the state with its submission. And in Section 110K3, that would be where EPA would point you for its statutory authority. It requires EPA to look at the submittal as a whole. But do you agree that we can ignore any irregularity with the CAMACS modeling if you prevail on your CALPUF argument? That's right, Your Honor. The court could rely entirely on the CALPUF modeling, which the state explicitly relied on, and which, frankly, has been used scores, if not hundreds of times, by states and by EPA since the beginning of the regional HAVE program. Louisiana is one of the last states to finalize its regional HAVE program, and CALPUF has been used for the subject-of-art screening process in almost every state. And did you say it has been used since 2017 beyond 300 kilometers? I'm not aware that any states have submitted a regional HAVE SIF during that period, but I could provide that answer. Isn't that important, whether or not anybody else is using it beyond 300 kilometers past 2017? It would be helpful to our case if that was true. I'm not aware that any states have even submitted a plan because, as we've discussed, we're pretty far along in the first planning period, and most states submitted their regional HAVE SIFs much earlier than 2017. Are you planning to talk about the Sierra Club's argument at some point? I'd be happy to. Turning to the environmental petitioner's argument, the court should also reject these challenges to EPA's approval of Louisiana's BART determination for SO2 at Nelson because EPA reasonably concluded, based on its review of the entire SIF submission, that Louisiana's SIF met all the applicable requirements of the Act and EPA's regulations. The court should also reject environmental petitioner's challenge to EPA's approval on the basis of alleged defects in Louisiana's long-term strategy because those arguments are waived, time-barred, and fail on the merits. First, EPA's approval of Louisiana's BART determination was reasonable. States have wide discretion in the formulation of SIFs, including discretion to weigh the five statutory factors for BART determinations in the regional HAVE context. The BART guidelines provide a process for states to follow in determining BART, and the statute mandates that states consider five specific factors in their determination, but neither the statute nor EPA's regulations dictate the priority place of those factors or require states to choose controls that produce the greatest emissions reductions or are even the most cost-effective. Louisiana explained that it reviewed all the information included in its submission, carefully weighed the five statutory factors, and chose low-sulfur coal as BART for SO2 at Nelson. "...based on consideration of economic, energy impacts, non-air quality environmental impacts, and impacts to visibility." EPA carefully reviewed the entire SIF submission, as it must under Section 110k3, and concluded that Louisiana's submission contained information that comported with the applicable requirements of the Act. Thus, EPA's approval of the submission was reasonable. Looking at environmental petitioners' criticisms in turn, the BART determination process is inherently source-specific, and the guidelines don't require states to determine BART by reference to prior determinations. Some variation is to be expected, given the source-specific nature of the process, and also given the discretion afforded to states in making the determination. The fact that Louisiana did not change its conclusion after EPA provided new information that corrected errors in the five-factor analysis originally provided by industry does not compel the conclusion that EPA's decision was unreasonable or that it failed to comply with the requirements of the Act. Such a rule would be unreasonable itself. Louisiana explained that it reviewed all the information in the SIF, which included EPA's accurate analysis, and explained why it chose low-sulfur coal as BART. After careful consideration, EPA approved that decision. The submission met the minimum standard that EPA could reasonably discern Louisiana's path to its BART determination from the record before the agency. As mentioned in the context of the industry challenges, EPA and the states work in partnership under a system of cooperative federalism to implement the Act. It is not uncommon for EPA to provide additional information to states during the SIF development process. EPA bears ultimate responsibility for ensuring that the Clean Air Act is implemented, and the agency has a great deal of technical and policy expertise in this area. As such, EPA works with states to help them craft their SIFs. Council for Environmental Petitioners seem to suggest that the word best from BART, the best available retrofit technology, that the Clean Air Act prescribes what best means. But that's not the case. The states have a great deal of discretion in determining, after looking at the five statutory factors which are required, what the state decides is best. The Sierra Club seemed to argue very strongly that the scrubbers were absolutely required because it was pretty much a no-brainer from their perspective that the outcome would be best. Can you address that? This is a classic difference in policy positions. If it were Environmental Petitioners' choice, I agree. It sounds like they would have chosen the scrubbers as a no-brainer, but it wasn't their choice. It was the state's choice. And the state is free to weigh those five factors in the way that is specific to that source and to the state's overall goals in implementing the Regional Haze Program. You don't have to reduce the most haze. That's not the only goal. That's not the only goal, and visibility benefits is one of the five statutory factors, but it's certainly only one of five. And nowhere in the guidelines or in the statute does that factor have privacy over the other factors or somehow serve to trump the other factors. The states are free to give weight to the different factors as they see fit. Turning to Environmental Petitioners' second argument about Louisiana's reasonable progress analysis and long-term strategy. The only aspect of the fifth that Environmental Petitioners take issue with in this respect is Louisiana's determination that Big Cajun II, a power plant in Louisiana, was the only facility in the state that may need to install additional controls as part of the state's plan to ensure reasonable progress. But that decision by the state was approved by EPA in 2012 in the 2012 Regional Rules. Therefore, this is actually a time-barred collateral attack on that earlier decision, and the court lacks jurisdiction to hear it. Is that Dolet Hill? It's Dolet Hill, Sierra Hunter. That's the power plant that Petitioners would have the state also consider additional control of that. So this is, again, a screening stage, just like the stage, similar to the stage that industry is challenging in the BART context. The state first performs a screening process where it decides if there are any sources that it should evaluate for additional controls. Here, notably, the state evaluated Big Cajun II for additional controls and concluded that none were necessary to achieve reasonable progress. So what the Environmental Petitioners would have the state change is to say at that screening stage that Dolet Hill should also be evaluated for further controls. It's not clear that the state would decide that further controls were appropriate there. The reason that this is a time-barred collateral attack is that the only gap that Louisiana needed to fill, the only aspect of its 2007 submission that EPA determined was inadequate, was based on care. So that was the gap that the state needed to fill, and that's what the state did here, and EPA approved it. Not only is this attack time-barred, but it's also EPA's position that this challenge has been waived. These same petitioners already petitioned EPA for administrative reconsideration on this exact issue, and EPA responded in full to that reconsideration petition. Petitioners have not challenged that here, and it would be a waste of the court's resources to address this claim when the relief the court would likely afford would be to remand to the agency for further explanation, which the agency has already provided to petitioners. And petitioners didn't challenge that decision. EPA explained in that reconsideration response why it was reasonable not to require further reductions from the one source Louisiana identified, Big Cajun II, and why it was not necessary for the state to go back and revisit the screening process, the screening stage that it had already conducted when it submitted its regional HAVE plan and reasonable progress analysis back in 2007. So it's our position that this is time-barred, this issue is waived, but even if the court were to look at it on the merits, it still fails. Petitioners point to one sentence buried deep in EPA's response to comments section of the 2012 regional rule, and from that ambiguous sentence, they read into that that EPA was requiring the state to go back to this earlier stage and redo an entire lengthy stage of its analysis, which it simply defies common sense that EPA would make such a decision in such a manner. The state obviously did not read that to be a command and didn't do that. EPA didn't intend that at the time. And so this simply can't bear the weight that petitioners ask it to bear. So what is the EPA's view of the simplest way to deal with this case before the court? EPA encourages the court to deny both petitions. The court could dismiss aspects of each petition as well as jurisdictional grounds, but the EPA encourages the court to deny and or dismiss both petitions in full. With some of my remaining time, I'd like to reframe the context of the industry challengers. Challenge 2 is subject to BART screening process. It's important to emphasize two things here, the role of Step 2 in the overall process for BART and the discretion afforded to the state at this stage. I've discussed the discretion that the states enjoy, but I'd like to spend a few moments talking about the nature of Step 2 at the screening stage. This step is implementing a statutory standard that sets a very low bar. In 42 U.S. Code 7491b2a, states and EPA are to look at sources that, quote, may be reasonably anticipated to contribute to any impairment of visibility, end quote. Importantly, EPA made key determinations about how that language should be interpreted and implemented in 2005 in a national rulemaking establishing the BART guidelines. Although this portion of the guidelines is not binding, industry offers no valid reason why Louisiana should be forced to depart from those recommended protocols. And given that statutory language, EPA decided back in 2005 that the analysis should be designed to assess the maximum potential impacts of a source under a range of realistic conditions. A wholly different analysis than determining what that source impact might be measured to be on a given day or a simple average of impacts over time. The purpose of this screening stage is to determine which sources should be assigned emission limits under BART. At the next step, Step 3, which is what environmental petitioners challenge, that's where emission limits are set and a fine-tuned analysis takes place then that looks at all the five factors as we've discussed. And if the source's impact on visibility is relatively borderline, which it's not here, your honors, these sources are well above the higher of the two thresholds looking at both types of modeling. But even if it were a relatively borderline case or if the controls wouldn't be cost-effective or create very much in the way of visibility benefits, that would be reflected in the choice of BART for the source. And it's important to note, for practical reasons, that industry hasn't challenged the choice of BART. They're simply challenging the screening process. I'd like to also briefly touch on... Will you speak to the complaint that the state's explanation in one paragraph was inadequate in failing to examine explicitly all of the factors instead of just saying that the factors were satisfied? What does the case law tell us about that and how should we address that? We have a lot of case law from the general context about how states have the primary role in crafting their implementation plan. In the regional case context, we have said in our brief, I can pull up the citations if it would be helpful for your honor, but it's the Oklahoma case where the court in the 10th Circuit explicitly said, it was Oklahoma versus EPA, that states have wide discretion in balancing the five factors. I understand that. More specifically, my question is, though, whether the state's explanation is adequate in terms of what is required. It is a very short explanation and it does not go into the factors, and the question is, what should we do with that? Admittedly, it is a short explanation, your honor, and I'm not aware of any case law that's directly on point. An analogy that we draw in the brief is to the general administrative law principle that's articulated by the Supreme Court in the Alaska Department of Environmental Conservation, which is to look at whether the agency's path may reasonably be discerned from the record. EPA used a similar standard here when they looked at the entire SIPP submittal, not just that paragraph to which your honor refers, but they looked at all the information that was included with the submittal and determined that it met the minimum requirements of the act. And they attach their prior one, I think it was 2012 or something, where they did put a little more meat on the bones? I'm not aware if they attached an analysis from 2012, but they did include both the five-factor analysis that was conducted by Entergy for Industry and also the five-factor analysis that was conducted by EPA, which corrected some of the errors in that earlier analysis. So the submittal is quite large. The narrative portion is admittedly short, but we would encourage your honor to apply those general administrative law principles. To say that it's adequate. To defer to EPA's judgment in looking at the entire submission that it was adequate and satisfied the act. Finally, I'd like to speak a little bit to the conservatism of the CalPUF model. Can you tell us about the deference that we have to give in that context? So EPA's informed judgment, based on its expertise in this area, that the statutory requirements are met. It's the general deference to an agency when it's performing. I mean, it's not scientific. Is there enough meat on the bone here? I mean, isn't that a very light deference we would give to that, if any? It would be a lower level of deference than the deference due to EPA's judgment about the appropriate use of the CalPUF methodology, which is a highly scientific and technical judgment. So in terms of degrees of deference, certainly EPA's do the highest form of deference under the case law to its judgment about the appropriate methodology. If it had deference, would we still reach that determination? I'm sorry? If we didn't believe there was any deference appropriate for that determination, would we still reach the answer that it was adequate? Certainly, Your Honor. The support for the CalPUF model that's outlined in our brief— I'm not talking about CalPUF. I'm talking about Louisiana's analysis and whether it's good enough. That question's not before the Court today. I'm not sure I'd be prepared to take a position on whether— Well, it is before the Court because the Sierra Club says it's not detailed enough. Well, in terms of whether EPA's decision was reasonable, we believe that, even without deference, that we encourage the Court to find that EPA's approval was reasonable after reviewing the entire SIP. I see that my time is up, so I must be— If there's anything else that you needed to cover that you haven't, you may have a little additional time, but you don't have to use it. Thank you, Your Honor. I'll just use a few minutes to address the criticism of CalPUF as overly conservative. This is something that industry comes back to again and again, and it's important to note that EPA was aware of the conservative nature of CalPUF when it chose CalPUF as the preferred model. And two things are really important here. One is that EPA chose CalPUF in part because of its tendency to be conservative. As I discussed earlier, the statute has a very low bar for what may be anticipated to cause or contribute to any visibility impairment. And so, in other words, the conservatism of CalPUF is a feature and not a bug. This is why the BART guidelines dictate that we use maximum 24-hour emissions rates, which is something that industry consistently ignored and failed to do. We're predicting the potential impacts of the source on visibility when that source is running at a steady state during meteorological conditions that are most conducive to the formation and transport of visibility-impairing pollutants. This is sort of like a perfect storm of the combination of factors that will cause the greatest impact. EPA explained why it made that policy choice in 2005 in the BART guidelines, and again in numerous BART analyses in subsequent years. Not only did EPA choose CalPUF partly on that basis, but EPA also made adjustments in its protocol to adjust for any overly conservative bias in the model. So instead of looking at that day of the 365 days in the year that had the greatest visibility impact, EPA looked at the 98th percentile, highest day. So that effectively cut off the tail of the distribution, so any outliers. It's about seven days of the year that get ignored under that analysis. So EPA made that decision using its expertise in scientific and technical modeling to correct for any overly conservative bias in the CalPUF modeling. EPA has continually approved and used CalPUF in regional HAZE plans across the country. It not only codified it in the BART guidelines in 2005, but EPA also affirmed its choice of CalPUF as the most appropriate methodology here just recently in 2017. So I encourage your honors to uphold EPA's decision on the basis of CalPUF, and even ignoring the CalPUF, as we explained in our brief, it cannot provide additional support for EPA's position being reasonable. Just one other question. The regional HAZE rule, which requires these 10-year periods, why wouldn't the 2018 apply in this case like it applied in the Texas and Oklahoma case? We didn't brief that issue, Your Honor, and unfortunately I don't have that with me, but I'd be happy to consult. Besides the case. The Texas case? Texas v. United States Environmental Protective Agency, 829 of 3rd 405. We do cite it. And it says that that was in 2018 due to the 10-year plan, and I don't understand what would be different here. And so maybe I'm missing something because you're the environmental people. Unfortunately, I don't have that information standing here at the podium, but I would be happy to discuss with the agency and provide supplemental briefing on that issue. All right. Thank you, Ms. Baines. Thank you. Mr. Smith? This is still on direct argument, not rebuttal, as I understand it. That's correct, Your Honor, and if I may step in in support of the subject of our determination here and answer a couple of questions that Judge Elrod had about the planning period. The planning period has been extended. Two years ago, EPA finalized a revision to the Regional Haze Rule that extends the planning period through 2021, and that's codified at 40 CFR 5308F. And EPA itself has determined in the context of the final BART rule in Texas that that period extends the window for the planning period. The new argument that industry raises that BART is somehow moot is simply not true. The Clean Air Act requires best available retrofit technology of some of the oldest and dirtiest sources in the United States, and part of the reason was that those sources had been grandfathered under the 1977 amendments to the Clean Air Act. And so Congress intended at some point that these old, highly polluting sources would someday come into compliance with more modern-day standards. And moreover, it's a one-time obligation, and so it's not a moot one. If this Court affirms the BART determination, Louisiana, either Louisiana or EPA, will look at BART specifically again. I would like to also come back and respond briefly to another argument that industry raised, and that I think you asked about as well, Judge Elrod, support for EPA's CAMEX modeling. Now, the Sixth Circuit has held in the Gorsuch case, which we cite in our brief, that where an agent or where a state lacks the expertise to evaluate a SIP, not a SIP, where a state lacks expertise to evaluate any kind of a plan, the agency must have the authority to come in and provide its own expertise. And indeed, that's what EPA is there for, to make sure that the SIP complies with the— But that wasn't Louisiana's situation, was it? They had their expertise, and they did their CalPERS. That's right, and we believe that Louisiana's determination on the subject of our issue should be upheld on CalPERS alone. If you reach the CAMEX issue, what's important to recognize here is that EPA came in not just because it wanted to do additional CAMEX modeling, but because it found so many errors in Entergy's analysis under CAMEX. Entergy itself, let's recall, conducted additional modeling because its position is that CalPUF is unreliable. It raised serious questions about the reliability of CalPUF. When EPA reviewed that CAMEX modeling that Entergy performed, it found so many errors in the CAMEX modeling that it was compelled to rerun the modeling using the correct parameters as required by the BART regulations. And EPA's CAMEX modeling corroborates and confirms the CalPUF modeling that shows that these units are subject to BART. I would point out again, as we do in the briefing as well, that Entergy's own initial CalPUF modeling shows that these units are, in fact, subject to BART in that they cause impairment above the regulatory threshold of contribution. And if you have no other questions, I will sit down. Yes, thank you, Mr. Smith. Mr. Street? Thank you, Your Honor. We're supporting EPA's determination of low-sulfur coal as BART and the ruling on reasonable progress and long-term strategy with respect to bellite hills. But first, I did want to briefly address the planning period issue. I think there's good reason EPA didn't cite the regulation that you just heard from the environmental groups, and that's because our understanding of that, a plain reading of that, is that it did not extend the planning period. It extended the deadline for submitting a SIP for the second planning period. So I think this court's observations in Texas v. EPA, at page 429 to 30, to the effect that the planning period does end 10 years after it begins at the end of 2018 and still hold. I believe EPA also may have extended the planning period specifically with respect to Texas to address some of the issues that were raised, but it did not broadly extend the planning period for others. Very briefly, a couple of quick points on the selection of BART as low-sulfur coal. I think, Judge Smith, you asked my friend with the EPA, what guidance do we have on the level of explanation that has to be given by the state? The statute and the regulation simply say that the state has to consider the five factors. It doesn't dictate any particular level of explanation. So I do agree with the EPA that traditional principles of administrative law would apply, such that if EPA could discern the rationale of the state, it should be affirmed, and this court should then in turn affirm the EPA. And I think while the state's explanation is brief, its path can be clearly discerned. It clearly says it considered multiple control options. It admitted that additional visibility benefits would be available through the use of a dry scrubber, but it determined that the lower-sulfur coal option results in visibility benefits, so some visibility benefits at a lower annual cost. So it weighed those two factors. And then in the next sentence it went on to talk about the non-air quality impacts that were negative from using the scrubber. And with respect to the five-factor analysis as a whole, both EPA and Entergy didn't just submit a bunch of information. We submitted analyses of the five factors, and the state's narrative explanation is perfectly consistent with both of those analyses, particularly when you consider the deference that I think everybody agrees that the states get in determining the weight and significance to give to each of the factors. There's no rule or statute that says you must select the control that reduces visibility impairment the most, you must select the most cost-effective control. There's nothing along those lines. And it's perfectly consistent with the statute and the reg for a state to select a control that does produce material visibility benefit, like the low-sulfur coal here, instead of a control that would produce more visibility benefit but has a seven-time greater annual cost. That's perfectly rational, and you can glean that readily from the state's analysis here. And I hope I might have a couple minutes just briefly to address the untimeliness of the reasonable progress challenge. And I'll just make two brief points on that. One is that I think at best Sierra Club can argue we weren't exactly sure what EPA was doing back in 2012 with respect to selecting sources to have reasonable progress controls. We think it was clear, but I think that's the most they can argue. And if they were correct that there was some lack of clarity about what EPA did in 2012, then they should have filed a petition for review at that time and asked this court or another court to clear up the lack of clarity. And I would think the evil picture line of cases from the D.C. Circuit is quite relevant on that point, which just briefly to quote, it says, Petitioners who delay filing requests for review on their own assessment of when an issue is right do so at the risk of finding their claims time-barred. I think that's exactly what happened here. In page 914 of that case, the D.C. Circuit says, If there's any doubt about the rightness of the claim, petitioners must bring their claim in a timely fashion or risk being time-barred. The final point on that just goes back to the reasonable planning period issue, which is the relief that's being requested of selecting new sources to be controlled for reasonable progress, that is completely moot with respect to the relief they're requesting because the planning period to do that is over. And in the next planning period, which is now underway and which will result in a new SIF by 2021, the state will have to go and do the exact same thing that CR Club wishes them to do. It will have to look at Dole Hills. It will have to look at every significant source in the state, and will have to do the reasonable progress analysis. So it's both effectively moot, and they're getting the exact relief that they want presently. That planning process is now underway for the 2021 period. So unless there are any further questions on the intervener's argument, I'll be back on rebuttal. Thank you, Mr. Street. All right, now Mr. Smith for rebuttal. Thank you, Your Honors. A couple of points that I'd like to get through as quickly as I can. On the deference issue, I would suggest that this Court's 2012 decision in Luminant provides some insight into the deference that EPA is entitled here. And in that case, the Court recognized that the agency's bald assertion that a SIF does or does not meet the requirements of the Clean Air Act is not entitled to heightened deference. And in fact, it's only entitled to the level of deference that it has the power to persuade and the thoroughness and validity of its reasoning. And I would suggest here that EPA's record shows that its reasoning is completely incoherent. As counsel for EPA recognized, it conducted its own analysis, which it deems accurate. And using the metrics and methodologies required under the BART regulations, no factor weighs in favor of low sulfur coal as the best available outcome. And it's not just a matter of which controls we prefer. The regulations require section Roman numeral 4E4, requires states to impose a 95% reduction rate unless there's a careful justification for another limit. And here the record is devoid of such a limit. I do want to, before I run out of time, come back to a couple of the reasonable progress arguments that have been made. On reconsideration, we did not challenge the reconsideration because in denying our petition, EPA itself denied that petition in part because we raised the arguments with sufficient specificity in this record. There was therefore no reason for us to challenge a different determination. This is not a collateral attack on the 2012 rule. EPA has not pointed to a single provision where it has proved any such determination that Big Cajun II is the only reasonable progress source. And in fact, the plain language of the rule is inconsistent with that reading. Again, EPA couldn't approve the long-term strategy because it relied in its entirety on the now defunct CARE rule. EPA also said it couldn't approve any portion of the SIP that relied on CARE. It wouldn't make any sense for EPA to have silently approved a supposed screening analysis that itself relied on CARE. And I'll point to the citation for that. A 1098 of the joint appendix makes clear that the underlying prioritization that Louisiana relied on in 2012 was in fact based on admission reductions it expected from CARE. That rule is no longer in existence. As a result, there is a gap in the state's plan. It does not have an approved long-term strategy. And EPA cannot correct that defect by simply providing additional explanation why it believes the state doesn't have to comply with the statute. I'd also like to point out on the collateral attack issue, I think the more apt and pertinent authority is this court's precedent in the El Paso case, which provides that an objection is a collateral attack only when a reasonable person would have perceived a very serious risk that the previous rule says what the agency now says it said. And the previous rule says no such thing. And I would encourage you to go back and look at that, because within the proposed rule, the technical support document, and the final rule in 2012, EPA says no less than seven times specifically that Louisiana will have to go back and evaluate whether admission reductions from any source, whether BART or not, are needed to make reasonable progress towards eliminating Hays. Louisiana and EPA failed to do that. And that directive, again, comes not just from EPA's disapproval of the 2012 rule. It comes from the statute itself, which requires every reasonable progress plan to include – every, pardon me, regional Hays plan to include elements to address the reasonable progress requirements of the act. And then finally, I do want to point out one inconsistency. A council for industry petitioner has mentioned at the outset with respect to the visibility prong of the BART determination and suggested that it was rational for EPA to defer to the state here because there would be material visibility benefit from low sulfur coal. Entergy Industries' own analysis states at Joint Appendix 3082 that there is no visibility improvement from any controls. Under its view of the modeling, there is no visibility improvement from any controls. So that is just sort of a red herring, Your Honor. And with that, I see my time is up. We would urge the court to vacate and remand with instructions to comply with the Clean Air Act. Thank you, Your Honor. All right. Thank you, Mr. Street. Mr. Street? Thank you, Your Honor. Just briefly to respond to that last point and then to turn to my rebuttal. Where we said there were no anticipated visibility improvements, first of all, that was a very early stage in the process when it wasn't clear what modeling was going to be used. And our view was that CALPUF was unreliable. It wasn't producing any showing of visibility harm to begin with. So it wasn't essentially as the process evolved and the models became clear, we, of course, took the position which EPA agreed with that there were controls that would create visibility improvements once you accept the validity of the models. But turning to my rebuttal point on whether Nelson and Brame should have even been subject to BART in the first place, my friend from EPA opened up her argument by quoting and saying, the EPA has found to the effect, quote, that it's generally acceptable to use CALPUF for larger emissions, over 300 kilometers, for sources with elevated stacks. I think it's important to point out that that quote is in this rule. It's not something EPA has said before. And when EPA just declared that in this rule, it didn't explain how any of the past rulemakings actually were cases of major emissions or elevated stacks, and it didn't explain why in this rule these sources counted as major emissions with elevated stacks. If it had done some of that analysis, we might be in a little bit different position. All EPA did is made that declaration and then it cited the two past instances where it had used CALPUF at greater than 300 kilometers. One was Nebraska. That was so old that there was no other option besides CALPUF at that time. I didn't hear EPA dispute that. The other was South Dakota where, correctly, EPA notes that EPA and the state did use a model of CALPUF for longer than 300 kilometer distances. But again, in that rulemaking, EPA said the quote general rule is we do not use it for longer than 300 kilometers. But here we work with South Dakota to create a specialized CALPUF model that addressed the shortcomings. Again, if they had done that here, we might be in a different position. Did they use elevated stacks in either of those? Not to my knowledge, and certainly EPA didn't put it on the present rulemaking, and they didn't mention that in their briefing to this court. They also mentioned this morning that the Texas SIP in 2009 used CALPUF. Again, that is almost a decade ago now. You're back in the era when you had no real developed options that were reliable at that point in time. Why isn't your argument about CALPUF usefulness better saved for the future? Because during this round, people did use CALPUF, but now going forward, we know more. So I think my friend from EPA was correct to point out that with respect, and my friend from CRCOG, I should say, was correct to point out that the BART determinations that were made in this first planning period are designed to be in place for a long time. So the use of CALPUF in this planning period to establish BART has significant going forward consequences. I think that's different from the point I was trying to make in my opening argument, perhaps inartfully, about the first planning period, that the first planning period has expired completely and irrevocably with respect to determination of reasonable progress sources for the first planning period. That's going to have to be completely redone and relitigated. So CALPUF will continue to be used at each stage here if it's allowed here, if it's time. I believe EPA would take a go-ahead from this court as exactly that, to continue using CALPUF for future reasonable progress evaluations, which has a somewhat similar analysis to the BART analysis. So I do think the court needs to address it now. And it's not telling EPA that EPA can never use CALPUF or states can never use CALPUF. The minimalist holding, I think, is that EPA needs to explain why it can be used for longer than 300 kilometers and that it must adjust its model if it's going to use it as it did in past rulemakings. And finally, the EPA argued that this court could consider the CAMEX modeling and that EPA could substitute its own CAMEX modeling for the methodology selected by the state. Their statutory site for that was the K-3 subsection of 7610. And that simply says, as EPA noted, that EPA can consider the whole SIF submitted by the state, and we don't dispute that. Of course, it can consider all the appendices and information, including that provided by the EPA. But what it cannot do under principles of federalism and the structure of the Clean Air Act is substitute its own methodology for a methodology that the state did not rely upon. And that's our position and why we would ask for that aspect of the EPA rule to be vacated. Thank you. Thank you, Mr. Street. This case is under submission and the court is in recess.